IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  1:04-CV-2174-WYD-CBS

ROCKY BALDOZIER,
ERIC STACK,
ROBERT REYNOLDS, and
JOK NICHOLSON, on behalf of themselves and all others similarly situated,

      Plaintiffs,

vs.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,

      Defendant.

---

## AMERICAN FAMILY'S MOTION FOR SUMMARY JUDGMENT ON FLSA CLAIM

---

      American Family Mutual Insurance Company ("American Family"), by and through its counsel, and pursuant to Fed. R. Civ. P. 56, respectfully requests that summary judgment on Plaintiffs' FLSA claim be entered in favor of American Family.

      ***Local Rule 7.1A Certification:*** Pursuant to D.Colo.L.Civ.R.7.1A, counsel for American Family has not conferred with Plaintiffs' counsel with regard to the filing of this motion since it is filed under Fed. R. Civ. P. 56.

## TABLE OF CONTENTS

SUMMARY OF UNDISPUTED FACTS ....................................................................... 2

STANDARD OF REVIEW ......................................................................................... 2

ARGUMENT: ANALYSTS ARE EXEMPT ADMINISTRATIVE EMPLOYEES. ................... 3

    I. All Analysts Earn a Salary of More than $455 per Week or $23,660 per Year. ..... 4

    II. Exempt Administrative Employees Perform Non-Manual Work Directly Related to their Employer's General Business Operations. ................................................. 4

    III. Exempt Administrative Employees Perform Work that Includes the Exercise of Discretion and Independent Judgment on Matters of Significance. ........................ 7

    IV. Analysts' Primary Duty of Resolving Claims is Directly Related to American Family's General Business Operations and Includes the Exercise of Discretion and Independent Judgment on Significant Matters. .................................................. 10

CONCLUSION ......................................................................................................... 15

APPENDIX 1 - DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

    American Family's Primary Business Function of Writing and Selling Insurance Policies.................................................................... App. 1 - 1

    The Named Plaintiffs' Employment with American Family and Their Salaries.................................................................................. App. 1 - 1

    Analysts' Primary Duty of Negotiating and Resolving Claims.......... App. 1 - 2

    American Family's Training of Its Analysts to Negotiate................ App. 1 - 3

    Analysts' Authority to Settle Claims....................................... App. 1 - 5

    Analysts' Use of Interpersonal Skills to Negotiate with Repair Facilities, Insureds and Claimants.......................................... App. 1 - 7

    Physical Damage Adjusters' Payment of Millions in Total Settlement Funds....................................................................... App. 1 - 8

    Physical Damage Adjusters' Payment of Millions in Settlement for Total Losses............................................................... App. 1 - 9

    Physical Damage Adjusters' Savings of Millions in Settlements for Repairable Vehicles....................................................... App. 1 - 9

Analysts' Representation of the Company in Resolving Physical Damage Claims to Vehicles…………………………………………….. App. 1 - 9

Analysts' Work in the Office and in the Field………………………….. App. 1 - 11

Independence of Analysts in the Field………………………………….. App. 1 - 11

In-Office Adjusters……………………………………………………….. App. 1 - 13

Analysts' Assurance of Proper Coverage Under the Policy………….. App. 1 - 14

Analysts' Evaluation of Risk and Loss…………………………………. App. 1 - 15

Analysts' Protection of Property Rights……………………………….. App. 1 - 17

Analysts' Use of Discretion and Judgment to Resolve Claims for Repairable Vehicles……………………………………………………….. App. 1 - 18

Analysts' Use of Discretion and Judgment to Resolve Total Loss Claims……………………………………………………………………… App. 1 - 22

Analysts With Customer Repair Program Duties…………………….. App. 1 - 25

APPENDIX II - STATE LAW AND UNPUBLISHED AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Munizza v. State Farm Mut. Auto. Ins. Co., No. 95-35794, 1996 WL 711563 (9th Cir. Nov. 7, 1996)

Spence v. Grange Mut. Cas. Ins. Co., No. 81AP-284, 1981 WL 3378, at *3 (Ohio Ct. App. July 30, 1981)

EXHIBITS

Exhibit A:………………Department of Labor and Employment Letter Dated September 1, 1998

Exhibit B: ………………………………………………………………….. Baldozier Deposition

Exhibit C: ………………………………………………………………….. Nicholson Deposition

Exhibit D: ……………………………………………………………………Reynolds Deposition

Exhibit E: …………………………………………………………………….Stack Deposition

Exhibit F: …………………………………………………………………….Blumenthal Affidavit

Exhibit G: …………………………………………………………………….Call Affidavit

Exhibit H:..................................................................................... Canney Affidavit

Exhibit I: ...................................................................................Gleason Affidavit

Exhibit J: ......................................................................................... Hill Affidavit

Exhibit K:................................................................................. Klinkner Affidavit

Exhibit L: ................................................................................. Saucedo Affidavit

Exhibit M: ...................................................................................... Wells Affidavit

Plaintiffs Baldozier, Stack, Reynolds, and Nicholson allege that American Family Mutual Insurance Company violated the Fair Labor Standards Act (FLSA) by failing to pay them overtime. However, based on their own testimony, the four named Plaintiffs are exempt from the FLSA's overtime requirement as administrative employees. Therefore, Plaintiffs' FLSA claims should be dismissed.

The fundamental summary judgment issue facing this Court is determining the primary duty of Physical Damage Claim Analysts ("Analysts"), the position held by the four named Plaintiffs. The Plaintiffs' entire case depends on the accuracy of their contention as to their primary job duty. Repeatedly counsel for the Plaintiffs contend that their primary job duty is "to generate accurate estimates for the repair of damaged vehicles or the value of 'total loss vehicles' according to the company's guidelines." Pls.' Reply Br. in Support of Mot. for Approval of Hoffmann-La Roche Notice at 1, 4.

Counsel for the Plaintiffs are wrong. The testimony of these four Plaintiffs establish that the primary duty of Analysts is to fairly and quickly resolve vehicular damage claims by insureds and third-party claimants. They were responsible for resolving anywhere from two to six or seven claims a day, involving boats, cars, motorcycles, trucks, recreational vehicles, and semi trucks. They were given authority ranging anywhere from $20,000 to over $100,000 to settle those claims without approval. Regardless of the quality of the estimate, or even whether the Analysts prepared an estimate at all, if they were able to resolve claims and close cases reasonably and fairly, they were successful in their position. See, e.g., Defendant's Statement of Undisputed Facts ("DSUF") 56, 57, 111. Conversely, if these Plaintiffs wrote a perfect estimate, but could not close files and fell behind in resolving claims, they failed in their job. Accurate

1

estimates, of course, make it easier for adjusters to close claims and bring a case to resolution, but they are only a tool to accomplish the primary duty of resolving the claim.

In pursuing the resolution of claims, Analysts exercise tremendous discretion and independent judgment in their day-to-day activities. They gather facts from insureds and claimants and assess their credibility. They identify potential fraud, subrogation, and underwriting risks. They examine coverage issues and determine whether a vehicle is a total loss or repairable. All of these items affect the settlement an insured receives. Perhaps most important to the resolution of claims, Analysts negotiate settlements with insureds, claimants, repair facilities, and lien holders. Indeed, the average Analyst spends well over $1 million of American Family's money annually, most of which is spent without any supervisory approval.

Plaintiffs' attempt to classify themselves as mere data processors falls woefully short when juxtaposed against their own admissions that their primary job duty includes the exercise of discretion and independent judgment on matters of significance. For that reason, they are exempt employees, and summary judgment is warranted.

## SUMMARY OF UNDISPUTED FACTS

Plaintiffs' admissions render the relevant facts undisputed. However, because the relevant facts are lengthy, American Family has requested permission to file Defendant's Statement of Undisputed Facts in an appendix to this brief and will provide a short summary of the facts in the argument section of this brief, as pertinent.

## STANDARD OF REVIEW

Summary judgment is warranted when there is no dispute as to the material facts, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears

2

the initial responsibility of demonstrating the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving

party who "must set forth specific facts showing there is a genuine issue for trial." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The party opposing summary judgment cannot

rest on its pleadings or merely reassert its previous allegations. Neither the "mere existence of

some alleged factual dispute," 477 U.S. at 247, nor the existence of "some metaphysical doubt as

to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986), is sufficient to defeat the motion.

## ARGUMENT:  ANALYSTS ARE EXEMPT ADMINISTRATIVE EMPLOYEES.

The FLSA establishes generally that employers must pay employees overtime for all

hours in excess of 40 per week. 29 U.S.C. § 207(a)(1). The FLSA exempts from overtime any

employee employed in a "bona fide administrative capacity" as defined by the Department of

Labor's (DOL) regulations. 29 U.S.C. § 213(a). The employer bears the burden of establishing

an applicable exemption. Aaron v. City of Wichita, 54 F.3d 652, 657 (10th Cir. 1995).

In 2004, DOL revised the regulations for the administrative exemption. See 69 Fed. Reg.

22122. Except for the salary levels, the new regulations clarify but make no substantive changes

to the requirements for the administrative exemption. 69 Fed. Reg. 22193 (noting that the test

for the exemption is "very similar, if not functionally identical" to the former test).

The new DOL regulations define a bona fide administrative employee as one:  (1) who

receives a salary of at least $455 per week ($23,660 per year); (2) whose "primary duty is the

performance of office or non-manual work directly related to the management or general

business operations of the employer or the employer's customers;" and (3) whose "primary duty

3

includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a) (2005).

To aid employers, employees, and the courts in applying its regulations, DOL provides specific examples of the type of jobs that typically satisfy the administrative exemption. Ironically, insurance claims adjusters are the first example. The regulations provide:

> Insurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

29 C.F.R. § 541.203(a).

## I.    All Analysts Earn a Salary of More than $455 per Week or $23,660 per Year.

From 2002 through 2004, all Analysts, including the named Plaintiffs, were paid a salary of more than $455 a week or $23,660 a year without any reductions or docking of pay. DSUF 11. The salaries of the four named Plaintiffs were significantly more than the exemption's threshold. DSUF 7-10. Accordingly, the salary factor for the administrative exemption is met.

## II.   Exempt Administrative Employees Perform Non-Manual Work Directly Related to their Employer's General Business Operations.

Plaintiffs do not contend that their work was manual labor. See also DSUF 47 (Analysts perform non-manual work resolving claims). The only question, then, under the second factor is whether Analysts perform work that is directly related to American Family's general business operations. Work "directly related to management or general business operations" means work related to the "running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29

4

C.F.R. § 541.201(a). It includes "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance . . . ." 29 C.F.R. § 541.201(b) (emphasis added).

In addition, the regulations provide that work that by itself would not be exempt is exempt if it is directly and closely related to exempt work. 29 C.F.R. § 541.703. For example, a business consultant may take notes regarding the flow of materials through a client's office and later personally type those notes. Standing alone, taking and typing notes would not be exempt work; however, "because this work is necessary for analyzing the data and making recommendations, the work is directly and closely related to exempt work." 29 C.F.R. § 541.703(b)(6). Although it is possible to assign the note-taking and typing tasks to non-exempt employees, "delegating such routine tasks is not required as a condition of the exemption." Id. As a result, work directly and closely related to an employee's exempt duties may include "recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a photocopier or fax machine." 29 C.F.R. § 541.703(a).

DOL has long recognized in both its regulations and opinion letters that claims adjusters typically perform work that relates directly to the general business operations of their employers—that is, adjusters service the business and do not work on a manufacturing production line or sell a product in a retail or service establishment. See, e.g., 29 C.F.R. § 541.203(a) (adjusters who perform such duties as interviewing insureds, preparing damage estimates, examining coverage issues, or negotiating settlements are exempt administrative employees). DOL recently issued a private sector opinion letter determining specifically that a claims adjuster's duties are "directly related to management policies or general business

5

operations. See Dep't of Labor WH Op., at *2 (Nov. 19, 2002), Daily Lab. Rep. (BNA) (Nov.

22, 2002) ("Opinion Letter" attached as Ex. A).[1] DOL noted that its own regulations identify

claims adjusters as jobs that ordinarily satisfy this factor. Id. at *2; see also 29 C.F.R.

§ 541.203(a). DOL stressed that claims adjusters perform duties related to servicing the business

because they represent the company and advise the management throughout the process of

gathering, assessing, and reviewing the claims. Id. DOL also noted the significance of the

adjusters' authority to settle claims without anyone's approval. Id. at *3. DOL also found it

significant that if an adjuster recommends erroneously to deny coverage, the company could be

liable for significant damages for bad faith. These factors, according to DOL, demonstrated that

the adjusters perform work directly related to the company's general business operations. Id.

 Courts concur with DOL that employees such as claims adjusters who negotiate with

clients and settle damage claims on behalf of an employer are servicing the business, not

engaged in manufacturing a product or sales work. Jastremski v. Safeco Ins. Co., 243 F.

Supp. 2d 743 (N.D. Ohio 2003) (adjuster who advised management on claims, planned how to

handle claim, and negotiated binding settlements performed work directly related to employer's

business operations); Palacio v. Progressive Ins. Co., 244 F. Supp. 2d 1040, 1046-47 (C.D. Cal.

---

[1] The U.S. Supreme Court has noted the persuasive power of DOL's application of its own regulations, stating that DOL's "policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case." Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944). It also noted:

> We consider that the rulings, interpretations and opinions of the Administrator under [the FLSA], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

Id. at 140; see also Dolan v. Project Constr. Corp., 558 F. Supp. 1308, 1310 n.2 (D. Colo. 1983) (DOL's interpretive bulletin regarding the FLSA was entitled to substantial weight); Kalista v. Sec'y of the Navy, 560 F. Supp. 608, 615-16 (D. Colo. 1983) (administrative interpretations entitled to substantial weight by reviewing courts).

2002) (adjuster serviced employer's business by negotiating with insureds, settling claims, advising company on claims, and representing company); accord Munizza v. State Farm Mut. Auto. Ins. Co., No. 95-35794, 1996 WL 711563 (9th Cir. Nov. 7, 1996) (adjuster performed work related to State Farm's business operations by negotiating settlements, collaborating with counsel in litigation and training employees); Spence v. Grange Mut. Cas. Ins. Co., No. 81AP-284, 1981 WL 3378, at *3 (Ohio Ct. App. July 30, 1981) (adjuster who examined whether claims were covered by policy and determined whether and what amount to pay in settlement was performing work directly related to employer's business operations ); see also Haywood v. N. Am. Van Lines, Inc., 121 F.3d 1066, 1072 (7th Cir. 1997) (customer service representative who negotiated with clients and settled damage claims was servicing business); Blinston v. Hartford Accident & Indem. Co., 441 F.2d 1365, 1366 (8th Cir. 1971) (adjuster was exempt administrative employee); James v. Cont'l Ins. Co., 424 F.2d 1064,1065 (3d Cir. 1970) (same); Hogan v. Allstate Ins. Co., 210 F. Supp. 2d 1312, 1321 (M.D. Fla. 2002) (insurance agents "servicing" Allstate because they are not involved in production of insurance policies which is "product" of Allstate).

As will be explained below in section I.D, the primary duty performed by American Family's Analysts of resolving claims fulfills this standard.

## III.   Exempt Administrative Employees Perform Work that Includes the Exercise of Discretion and Independent Judgment on Matters of Significance.

An employee must also exercise discretion and independent judgment to satisfy the administrative exemption. 29 C.F.R. § 541.200(a). DOL defines discretion and judgment to require "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," with the employee having the

power to make an independent choice, free from immediate direction or supervision, on significant matters. 29 C.F.R. 541.202(a) & (c).  DOL has determined, however, that an exempt employee does not need final, decision-making authority over matters of importance in order to satisfy the discretion and independent judgment element.  "The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." 29 C.F.R. § 541.202(c).  The fact that "many employees perform identical work or work of the same relative importance" also does not mean that the employee is not exercising discretion and independent judgment.  29 C.F.R. § 541.202(d).  Rather, one must consider "the employee's relative freedom from direct supervision."  29 C.F.R. § 541.700(a).

In its November 19, 2002 Opinion Letter, DOL concluded that claims adjusters exercised discretion and independent judgment on matters of significance because they had authority to settle claims from $3,000 to $50,000 without supervisory approval.  Opinion Letter at *3-4. While recognizing that some adjusters had $3,000 limits, DOL noted that even these adjusters generally made recommendations to their supervisors on the appropriate value for larger claims, which were frequently accepted.  Id. at *4.  In addition, once approved, adjusters proceeded with the same independence as they did on other claims, determining the most appropriate method for resolving the claim within the approved amount.  Id.  According to DOL, these facts demonstrated that adjusters were "not merely pursuing a standardized format for resolving claims," but were using their own judgment about what the facts showed and how to resolve the claim successfully.  Id.

8

Courts have held routinely that adjusters who negotiate with clients and settle damage claims on behalf of an employer, exercise discretion and independent judgment on matters of significance. For example, the Eighth Circuit affirmed the district court's grant of summary judgment to a life insurance company on the grounds that a claims examiner was exempt from the FLSA. McAllister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 998 (8th Cir. 2003). The Eighth Circuit rejected the adjuster's assertion that she simply adhered to policy manuals and state law, noting that the issue was not whether she had discretion to disregard state law or the claims manual, but whether her primary duty included the exercise of discretion and independent judgment. Id. at 1001. The court noted that employees were required to use common sense and their own judgment to resolve claims. Id. at 998-99, 1001.[2]

The District Court for the Northern District of Ohio also held on summary judgment that a claims adjuster exercised discretion and independent judgment needed for the administrative exemption. Jastremski, 243 F. Supp. 2d at 758. Noting the similarities between the plaintiff's job duties and those in DOL's Opinion Letter, the court emphasized that the adjuster analyzed data and drew conclusions with real consequences for his employer. Id. at 752-53. The court rejected the adjuster's argument that he simply entered information into a computer. The court relied specifically upon the adjuster's settlement authority of $15,000 in reasoning that the discretion and independent judgment factor had been met. Id. at 756-57; see also Palacio, 244 F. Supp. 2d at 1046-48 (adjuster with a settlement authority of $5,000-$7,000 exercised discretion and independent judgment); Munizza, 1996 WL 711563, at *3-4 (adjuster exercised

---

[2] DOL's new regulations are in accord with the Eighth Circuit's assessment on the use of manuals: "[t]he use of manuals, guidelines, or other established procedures . . . does not preclude exemption . . . . Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status." 29 C.F.R. § 541.704.

discretion because he negotiated settlements, collaborated with counsel in litigation and trained employees); <u>Blinston</u>, 441 F.2d at 1365-66 (adjuster working only under general supervision exercised discretion and judgment when he could settle claims of $3,000 without management approval and settled the bulk of the cases within his authority).

**IV.     Analysts' Primary Duty of Resolving Claims is Directly Related to American Family's General Business Operations and Includes the Exercise of Discretion and Independent Judgment on Significant Matters.**

An even cursory review of the duties American Family's Physical Damage Claim Analysts perform demonstrates unmistakably that they perform work directly related to American Family's general business operations and exercise discretion and independent judgment on significant matters. To begin, Analysts who resolve claims are involved in servicing American Family's business. American Family's primary business function is to design, market and sell insurance policies. DSUF 1-6. It offers resolution of claims as an ancillary service to its insureds.

To provide this service, American Family assigns specific claims to its Analysts to handle from beginning to end. DSUF 5, 14-15, 48. They resolve claims for physical damage to automobiles, trucks, RVs, motorcycles, snowmobiles, boats and semi trucks.[3] DSUF 12, 47. American Family's Analysts exercise discretion and independent judgment to resolve claims with angry third-party claimants or insureds who are concerned about the repair or replacement of what is typically one of their most valuable assets. Most of what Analysts do involves comparing and evaluating possible courses of conduct. Analysts represent the company in their

---

[3] Some field Analysts also have job duties with respect to American Family's Customer Repair Program (CRP). DSUF 129. These Analysts monitor the performance of repair shops that are given authority to repair vehicles without any American Family personnel ever examining the damaged vehicle. DSUF 130-31. These Analysts audit the shops' work by performing surprise "reinspections" of damaged vehicles inspected by the shops to make sure they are being fair and honest with American Family. DSUF 132.

work of resolving claims.  DSUF 48-50.  For each claim, they are the contact person between American Family and the public.  DSUF 48-50.

Analysts may work in the office or in the field.  DSUF 51.  (Baldozier, Nicholson, and Reynolds worked almost exclusively in the field; Stack did both.  DSUF 52.)  Analysts who work in the office evaluate written estimates of damages submitted by independent repair facilities and negotiate and resolve those claims.  DSUF 64-66.  In contrast, Analysts in the field travel to the vehicle to resolve a claim.  DSUF 12, 53.  Analysts in the field are provided a company car, computer, printer, camera, cell phone and a checkbook and operate as a full-service office on wheels.  DSUF 54-55.

Analysts "pay what's fair" and are instructed to put an insured or claimant in the position they were in before the accident, within the confines of the policy.  DSUF 13.  To do so, Analysts interview claimants and insureds, gather evidence, assess credibility, and evaluate physical damage to vehicles.  DSUF 77, 90.  Analysts are responsible for identifying potential subrogation claims, fraud, and underwriting risks for further investigation.  DSUF 73-87. Because Analysts are the only persons investigating any particular claim, American Family relies on its Analysts to limit these types of losses.  DSUF 74.

Analysts also exercise discretion and judgment in examining issues related to coverage. Analysts may confirm that a policy was in effect at the time of the loss and determine which policy coverage applied (i.e., collision or comprehensive), the proper deductible for the loss, whether an insured has rental coverage, any potential fraud, or whether there is any prior damage to the vehicle, unrelated to the loss.  DSUF 68-70, 75-76, 85-87.  An Analyst's determination of these issues affects what amount, if any, the insured receives.  DSUF 69.  Reynolds himself

confirmed the importance of an Analyst determining which policy coverage applied, agreeing that it could affect the amount paid to the insured.  DSUF 69.

Analysts also must determine whether a vehicle is a total loss or repairable based on their training, judgment and experience.  DSUF 89, 116-17, 127-28.  For claims involving property damage to boats, motorcycles, RVS, snowmobiles or semi trucks, there is no estimating software to aid an Analyst in preparing an estimate.  DSUF 102-03.  Rather, in those cases, Analysts must research the costs of repairs and total loss by contacting other companies for quotes or performing other research.  DSUF 102-03.  To determine if any vehicle is a total loss, the Analyst must evaluate the condition of a vehicle's interior, exterior, tires and mechanical system and give subjective numerical ratings based upon their experience and judgment.  DSUF 118-122.  These ratings have a significant impact on the actual cash value of the vehicle and the amount the Analyst pays on behalf of American Family for the claim.  DSUF 120.  Analysts must also determine the salvage value for any vehicle that an insured or claimant wishes to retain.  DSUF 123-126.  Analysts use their interpersonal skills to negotiate total loss settlements with insureds and claimants.  DSUF 36, 39-42.  American Family provides training on negotiation so Analysts can better perform their jobs.  DSUF 16-26.

For repairable vehicles, Analysts gather information from insured or claimants about added-on equipment or recent repairs, anticipate whether there is additional damage hidden from view, determine the appropriate level of betterment and appearance allowances for the repair, and decide whether to replace or repair damaged parts.  DSUF 90-101, 104-10.  Reasonable Analysts may look at the same vehicle and come to different conclusions about whether a part should be repaired or replaced—a decision that is involved in 25% to 40% of an adjuster's total

12

estimates. DSUF 94-95.  Similarly, Analysts may disagree with body shops about whether a damaged part should be repaired or replaced—not surprisingly, as body shops often prefer to replace a damaged part rather than repair it, and prefer to replace a damaged part with an original equipment manufacturer (OEM) part instead of an aftermarket part because it is more profitable. DSUF 96-97, 112-15.  For that reason, Analysts must determine independently whether to complete a repair with an OEM, aftermarket or salvage part.  DSUF 98.  If an Analyst chooses to repair a part, he or she must negotiate and come to an agreement with the repair facility on the hours it will take to repair the part and the cost of the repair.  DSUF 37-38, 100, 113.  Analysts determine repair hours based solely on their discretion and experience; there is no computer program or software available for estimating repair times.  DSUF 100, 113.

Ultimately, however, the Analyst must make an offer of settlement to an insured or claimant and negotiate to resolve the claim.  DSUF 27-42.  Analysts have authority to settle claims without any prior supervisory approval.  DSUF 29-34.  Reynolds' and Baldozier's settlement authority was the actual cash vehicle of the vehicle, which could be $90,000 or higher for an expensive car, semi truck, boat or recreational vehicle.  DSUF 31-32.  Nicholson and Stack also had authority ($45,000 and $20,000, respectively) to settle claims without prior approval.  DSUF 33-34.  Even for claims in excess of their established authority, Analysts recommend appropriate settlements that are often approved by their supervisors.  Once approved, the Analyst continues to resolve the claim.  DSUF 35.  Analysts' settlement offers bind American Family once accepted.  DSUF 28.  Analysts also are responsible for issuing payments to insureds and claimants (indeed, Analysts carry American Family checkbooks), and must protect the rights of any lien holder who may have a financial interest in the vehicle.  DSUF 27,

13

54, 88.  Finally, if a claim cannot be settled, Analysts participate in litigation, often testifying on behalf of the company at trial.  DSUF 73.

Settlement decisions of Analysts have a significant financial impact for American Family.  The amount of settlement funds paid out by each adjuster is staggering.  DSUF 43-46.  Physical damage adjusters in the Denver office in 2002 alone paid out over $131 million in settlement dollars, or $3.8 million per adjuster.  DSUF 43.  In Des Moines, that amount was over $47 million, or $2.9 million per adjuster.  DSUF 43.  In Kansas City, it was over $82 million, or $3.2 million per adjuster.  DSUF 43.  In addition, if an Analyst denies coverage for a claim erroneously, American Family may be exposed to significant financial damages for bad faith, including punitive damages potentially.  DSUF 71.  For that reason, Analysts are aware of the importance of avoiding bad-faith handling of claims.  DSUF 72.

In truth, Analysts in the field have almost unbridled freedom.  See DSUF 58-63.  They rarely come into the office—as little as two or three times a year—and only then to pick up supplies or attend a meeting.  DSUF 62.  Analysts in the field have control over their own work day and do not "punch a time clock."  DSUF 58.  They have flexibility to go out in the field three days a week or all five.  DSUF 59-60.  They can start early and end early or start late and end late.  DSUF 67.  Analysts work out of their homes, set their own hours, and schedule their own appointments.  DSUF 54, 58.  At least one adjuster stayed home two days a week to do paperwork.  DSUF 59.

One of the factors to consider when analyzing the administrative exemption is "the employee's relative freedom from direct supervision."  29 C.F.R. § 541.700(a).  As shown above, Analysts who work in the field, such as the named Plaintiffs, have immense freedom.  In

fact, freedom from direct supervision is exactly what Stack enjoyed about his job with American Family. See DSUF 67 (stating that he initially turned down the Analyst job because it was an inside position and he was "not real happy working inside" whereas field adjusters had "more freedom to work"); see also DSUF 59, 61 (Baldozier liked working in the field because he did not like being confined to an office and would try to arrange his schedule such that he was in the field only three days a week and would spend two days at home).[4]

In short, Analysts' duties do not involve American Family's product, that is, the writing and issuing of insurance policies. DSUF 1-4. Rather, they involve servicing American Family in the same manner that claims adjusters have traditionally done so, as reflected in DOL regulations. Analysts' primary duty of negotiating and resolving claims is directly related to serving American Family's business and requires Analysts to exercise discretion and independent judgment on a variety of matters.

## CONCLUSION

American Family respectfully requests summary judgment because Physical Damage Claim Analysts like the named Plaintiffs are exempt from the FLSA as administrative employees.

---

[4] Baldozier and Stack also allege overtime violations of Colorado state law. American Family has moved to dismiss the state law claims on grounds that the insurance industry is exempt from Colorado's Minimum Wage Order 22. However, even if Wage Order 22 applied, Plaintiffs still would be exempt from state overtime laws because like the FLSA, the Wage Order exempts administrative employees. Wage Order 22 at (5).

15

DATED this 27th day of June, 2005.

Respectfully submitted,


_____*s/ Julie M. Williamson*_____
Julie M. Williamson
Barbara Z. Blumenthal
Anthony L. Giacomini
Kyle C. Velte
HOFFMAN REILLY POZNER & WILLIAMSON LLP
511 – 16th Street, Suite 700
Denver, Colorado  80202
Telephone:  303-893-6100

and

Earl H. Munson
Sarah A. Zylstra
BOARDMAN, SUHR, CURRY & FIELD, LLP
One South Pinckney Street, 4th Floor
PO Box 927
Madison, WI  53701
Telephone:  608-283-1796

ATTORNEYS FOR DEFENDANT AMERICAN FAMILY MUTUAL
INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

rhill@hillandrobbins.com
arocklin@hillandrobbins.com
jhunt@hillandrobbins.com

And I hereby certify that I have mailed or served the document to the following non CM/ECF participants in the manner indicated by the non-participant's name:

James M. Finberg, Esq.  (Via Mail)
Eve H. Cervantez, Esq.
Nirrej S. Sekhon, Esq.
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339

Steven G. Zieff, Esq.  (Via Mail)
Kenneth J. Sugerman, Esq.
David Lowe, Esq.
RUDY, EXELROD & ZIEFF, L.L.P.
351 California Street, Suite 700
San Francisco, CA  94104

Michael Rubin, Esq.  (Via Mail)
ALTSHULER, BERZON, NUSSBAUM,
RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, CA  94108

Thomas A. Warren, Esq.  (Via Mail)
LAW OFFICE OF THOMAS A. WARREN
2032-D Thomasville Road
Tallahassee, FL  32308
Facsimile: 850-385-6008

Jeffrey Lewis, Esq.  (Via Mail)
LEWIS, FEINBERG, RENAKER &
JACKSON, P.C.
1330 Broadway, Suite 1800
Oakland, CA  94612

_____ *s/ Julie M. Williamson* _____
Julie M. Williamson

17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:04-CV-2174-WYD-CBS

ROCKY BALDOZIER,
ERIC STACK,
ROBERT REYNOLDS, and
JOK NICHOLSON, on behalf of themselves and all others similarly situated,

  Plaintiffs,

vs.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,

  Defendant.

## APPENDIX 1 – DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF AMERICAN FAMILY'S MOTION FOR SUMMARY JUDGMENT ON FLSA CLAIM

### American Family's Primary Business Function of Writing and Selling Insurance Policies

1. American Family is a Wisconsin mutual insurance company whose primary business function is writing policies of insurance. Its employees design, create, market and sell automobile, homeowner's, health, commercial, and farm/ranch insurance policies to individuals and businesses in 17 states. Gleason Aff., ¶¶2-4; Canney Aff., ¶¶2-3.

2. Ancillary to its function of writing and selling policies, American Family investigates, evaluates, negotiates and resolves claims that arise only under its own policies. Gleason Aff., ¶5.

3. The vast majority of American Family's customers never make a claim and therefore, never come into contact with any claims personnel. Gleason Aff., ¶5.

4.      American Family achieves its operating profit from the marketing and sale of its insurance policies.  It does not make a profit from its claims adjusting service.  Gleason Aff., ¶4.

5.      For policyholders who have claims, American Family employs claim personnel to assist in resolving claims made against or by its insureds.  The company has employees in four different claim specialties:  Casualty (personal injury); Physical Damage (vehicular damage); Property (homeowner) and Commercial-Farm/Ranch.  Canney Aff., ¶4.

6.      Within each of the four claim specialties, there are five levels of employees: Claim Representative for training (a non-exempt position), Claim Representative, Claim Analyst, Claim Examiner and Claim Specialist.  Canney Aff., ¶5.

**The Named Plaintiffs' Employment with American Family and Their Salaries**

7.      American Family hired Rocky Baldozier for its Denver office in 1992.  He left American Family for a short time to become an insurance agent and was rehired as a Physical Damage Claim Analyst, working from December 2000 until July 2004.  His annual salary at the time of rehire was $41,500.  Baldozier Dep., 6:7-7:7, 17:6-9, 221:3-5; Baldozier Dep. Ex. 58.

8.      American Family hired Eric Stack in October 2000 for its Denver office as a Physical Damage Claim Analyst and terminated him in October 2003 for "failure to meet expectations."  His annual starting salary was $46,250.  Stack Dep., 81:11-83:9, 193:4-17.

9.      Robert Reynolds worked for American Family's Kansas City office from August 2001 until September 2003 as a Physical Damage Claim Analyst.  His annual salary was "probably somewhere close to $40,000."  Reynolds Dep., 75:25-76:11, 87:1-6, 273:3-9.

10.     Jok Nicholson worked for American Family's Des Moines, Iowa office from September 2001 until August 2004 as a Physical Damage Claim Analyst.  His annual salary was

$48,708 when he left American Family.  Nicholson Dep., 35:6-7, 191:4-8, Dep. Ex. 102, Dep. Ex. 104 at ¶2; Wells Aff., ¶3.

11.     During the relevant time period, all Physical Damage Claim Analysts (hereinafter "Analysts"), including the named Plaintiffs, received a salary of more than $455 a week or $23,660 a year on a bi-weekly basis without reduction or docking of pay.  Canney Aff., ¶44; Baldozier Dep., 116:15-25.

**Analysts' Primary Duty of Negotiating and Resolving Claims**

12.     The primary duty of an Analyst is to resolve claims.  Reynolds Dep., 147:1-151:25, 247:13-25, 259:24-260:1; Stack Dep., 199:2-13, 210:20-24, 222:9-15; Baldozier Dep., 32:14-33:14, 54:4-21, 128:14-19; Nicholson Dep., 140:2-22; Blumenthal Aff., ¶¶2, 4, 6; Call Aff., ¶5; Canney Aff., ¶¶37, 40.

13.     Baldozier described his job as follows:  "My job was to pay what's fair—indemnify, as I was taught.  Put them back to preaccident condition for what the policy they bought.  Or, as I was taught, we're legally liable.  We pay them for what they lost and that was my job."  Baldozier Dep., 54:6-10.

14.     Nicholson describes the difference between "appraisers" and "adjusters," stating that appraisers "just appraise damage on vehicles" whereas adjusters "have to take the claim from A to B, so to speak, the whole thing, the whole facet."  Nicholson Dep., 20:16-25.

15.     Reynolds similarly distinguishes between an "estimator" and an "adjuster," stating that an estimator "does just an estimate and adjuster does the other things" such as settling the claim.  Reynolds Dep., 12:9-18.

App. 1 – Page 3

16.     American Family has a job description for its Physical Damage Claim Analysts. The job description identifies "Negotiation and Settlement" as one of the primary responsibilities for Physical Damage Claim Analysts. Reynolds Dep. Ex. 27; Canney Aff., ¶16.

**American Family's Training of Its Analysts to Negotiate**

17.     American Family offers various training programs to its Physical Damage claims personnel. Klinkner Aff., ¶2.

18.     American Family provides a Physical Damage excel WEB training program for its Physical Damage employees. Included in the total loss training is training on negotiation because "[s]olid negotiation skills are essential to be successful as an adjuster." Klinkner Aff., ¶2 & Ex. A.

19.     As part of the excel WEB training program, adjusters complete worksheets that ask a participant specifically about the negotiation portion of the training. Klinkner Aff., ¶2.

20.     In addition to the excel WEB training program, American Family offers an Excel development program on customer service for physical damage claim adjusters. This course "explains the fundamentals of claims customer service, phone techniques, how to deliver bad news and conflict resolution." Klinkner Aff., ¶4, Ex. B.

21.     There is a student manual for the Excel development training for physical damage claim adjusters, which contains a chapter on negotiation and provides techniques for participants to improve their negotiation skills. Klinkner Aff., ¶5, Ex. C.

22.     American Family also offers a physical damage skills workshop. Klinkner Aff., ¶6, Ex. D. Out of the eight modules of the course, two involve negotiation. One module teaches about negotiations generally, and another module is focused on negotiating total losses

specifically. Klinkner Aff., ¶6, Ex. D. As part of the workshop, participants review damaged

vehicles and then participate in role-playing exercises with actors to negotiate both total loss

settlements and settlements of repairable vehicles. Klinkner Aff., ¶6, Ex. D. The negotiations

are videotaped and sent to the employee's manager at the end of the workshop. Klinkner Aff.,

¶6, Ex. D.

23.     American Family also offers its adjusters a subset of the Excel development

program that encompasses training solely on negotiations. The target audience of this 4-hour

course (as specifically identified in its curriculum) is physical damage claim adjusters. Klinkner

Aff., ¶7, Ex. E at 1. During the course, participants are asked to list what matters can and cannot

be negotiated in their job as physical damage claim adjusters. Klinkner Aff., ¶7, Ex. E at 11.

The training identifies the following items as being negotiable: actual cash value, settlement

amount, parts' prices, labor rates, storage, towing, appearance allowances, betterment, repair

time, and rental. Klinkner Aff., ¶7, Ex. E at 11. Items identified in the training as non-

negotiable are: tax, deductible, and the policy. Klinkner Aff., ¶7, Ex. E at 11.

24.     American Family also has offered a separate course entitled "Advance

Negotiations" to its physical damage claim adjusters. Klinkner Aff., ¶8, Ex. F. The company

provides an 80-page training guide to participants, which includes such topics as Win-Win

Strategies, Sales Techniques, Strategies to Persuasion, and Problem Solving. Klinkner Aff., ¶8,

Ex. F.

25.     Baldozier took a one or two-day training class called Win-Win Negotiation while

at American Family and believed that it improved his negotiation skills. Baldozier Dep., 57:4-

58:11; 235:2-236:15.  He was taught "how you negotiate, what you are to do, what you can and cannot say or what-have-you, and to settle the claim." Baldozier Dep., 57:4-21.

26.    Nicholson took the mini Excel training at American Family, which included training on negotiating with insureds, claimants and repair facilities.  Nicholson Dep., 212:5-8; Klinkner Aff., ¶9.

**Analysts' Authority to Settle Claims**

27.    Analysts issue payments to the appropriate parties once a settlement is reached. Nicholson Dep., 61:7-62:9, 83:15-19, Dep. Ex. 80 at AMFAM2393; Baldozier Dep., 28:21-31:1, 53:2-10, 128:14-129:22; Stack Dep., 39:2-9, 141:14-24, 211:23-212:11; Reynolds Dep., 218:6-15, 259:14-23; Saucedo Aff., ¶24; Blumenthal Aff., ¶2; Call Aff., ¶5; Wells Aff., ¶8.

28.    An Analyst's settlement offer to a repair facility, insured, or claimant binds American Family to this settlement once it is accepted by the claimant or the insured.  Canney Aff., ¶30.

29.    All Analysts are assigned a settlement authority limit and have authority to settle claims within their limit without prior approval of a manager.  Baldozier Dep., 122:8-124:2, 128:14-129:22, 132:22-134:15; Nicholson Dep., 61:7-62:9, 89:19-91:5; Stack Dep., 141:14-24, 194:14-195:21; Reynolds Dep., 147:1-148:17, 259:14-23; Canney Aff., ¶¶27, 41; Blumenthal Aff., ¶3.

30.    An Analyst's settlement authority is set by his or her Manager depending on the experience of the Analyst.  Canney Aff., ¶27.

31.    Reynolds' settlement authority was the actual cash value of the vehicle up to the insured's policy limits.  Therefore, if a vehicle's actual cash value (like a large Mercedes Benz)

is $90,000 and the insured had a policy for $100,000, he could settle the claim for $90,000 or less without prior management approval. Reynolds Dep., 147:1-148:17; Canney Aff., ¶27.

32.    Baldozier's settlement authority between December 2000 and January 2003 was the actual cash value of the vehicle, meaning he could settle any claim for the vehicle's actual cash value or less without prior management approval. Baldozier Dep., 118:9-120:7.

33.    Nicholson's settlement authority in 2003 was $45,000 for comprehensive and collision claims. He could authorize checks of $45,000 or less without prior management approval. Nicholson Dep., 89:19-91:5.

34.    Stack's settlement authority was $20,000 at the time of his termination of employment. He could authorize checks of $20,000 or less without prior management approval. Stack Dep., 141:14-24, 194:14-195:21.

35.    An Analyst may make recommendations to management that he or she be allowed to exceed his or her settlement authority for a claim. Once approved, the Analyst handles the resolution of the claim, just like any other claim. Baldozier Dep., 134:16-137:6; Stack Dep., 194:14-195:21; Canney Aff., ¶31; Blumenthal Aff., ¶3.

## Analysts' Use of Interpersonal Skills to Negotiate with Repair Facilities, Insureds and Claimants

36.    American Family has no "scripts" for negotiations, rather Analysts use their own interpersonal skills to resolve claims. Wells Aff., ¶26.

37.    Analysts must come to an agreed price with the repair facility to repair a vehicle. Baldozier Dep., 144:3-145:14; Stack Dep., 141:9-24, 144:10-145:10, 149:24-150:3, 208:20-24; Nicholson Dep., 61:16-62:9, 68:2-20; Canney Aff., ¶20; Call Aff., ¶5; Blumenthal Aff., ¶¶2, 5; Saucedo Aff., ¶¶13, 24.

38.     Analysts negotiate with repair facilities to reach an agreed price. Baldozier Dep.,
56:25-58:8, 63:20-65:1, 142:5-145:14, 185:17-187:9, 235:2-236:15, Dep. Ex. 50 at
PLRB000175; Stack Dep., 161:15-162:20; Nicholson Dep., 68:2-20, 128:23-131:3, 148:15-
151:1, Dep. Ex. 80 at AMFAM2393; Canney Aff., ¶¶37, 40, 41; Saucedo Aff., ¶¶13, 18, 24-25;
Blumenthal Aff., ¶5; Call Aff., ¶¶10-12; Wells Aff., ¶¶26, 30, 33, 38; Hill Aff., ¶9.

39.     For total loss claims, Analysts must reach an agreed price with the insured or
claimant on the value of the claim. Baldozier Dep., 93:9-100:11, 105:1-24, 218:20-219:7;
Reynolds Dep., 124:3-25, 220:21-222:16, 246:7-247:25; Stack Dep., 141:9-24, 207:22-208:24,
222:9-15; Nicholson Dep., 70:13-17, 78:23-83:19, 114:20-116:4, 128:23-129:25, 142:2-144:16,
161:9-162:10, 182:16-184:15, Dep. Ex. 86 at 2-5; Wells Aff., ¶21; Call Aff., ¶5; Blumenthal
Aff., ¶¶2, 6; Saucedo Aff., ¶19; Hill Aff., ¶9.

40.     For total loss claims, Analysts negotiate with insureds or claimants to reach an
agreed price. Baldozier Dep., 51:5-58:11, 93:9-100:11, 105:1-24, 142:5-148:11, 235:22-236:15,
Dep. Ex. 50 at PLRB000175; Reynolds Dep., 103:3-105:2, 122:23-124:25, 220:21-222:16,
246:7-247:25, 251:7-252:13; Nicholson Dep., 70:13-17, 78:23-83:19, 114:20-116:4, 128:23-
131:3, 142:2-144:16, 182:16-184:15; Saucedo Aff., ¶¶19, 21, 25; Call Aff., ¶¶10-12; Blumenthal
Aff., ¶¶6, 11; Wells Aff., ¶¶21, 25, 38; Canney Aff., ¶¶37, 40, 41; Hill Aff., ¶9.

41.     American Family expected its Analysts to resolve any disputes with their
customers and settle the claim fairly and reasonably. Reynolds Dep., 246:7-247:25.

42.     In a Performance Assessment, Nicholson rated himself "exceptional" on Conflict
Resolution, stating that "I can't think of one customer conflict that I couldn't handle." He rated
himself "exceptional" on Negotiation, stating that "I'll put my negotiating ability up against

anyone" and "I feel negotiations are not only about how cheap you can settle a claim, I think it is more about reaching a fair settlement and having the customer feel like they understand and agree with the final settlement offer." Nicholson Dep., 116:21-117:17, 124:21-125:5, 128:23-131:3.

**Physical Damage Adjusters' Payment of Millions in Total Settlement Funds**

43.     Physical Damage adjusters in Denver paid over $131 million in 2002 in settlement funds (total loss and repairable vehicles), averaging roughly $3.8 million for each adjuster. In Des Moines, the amount was over $47 million, or roughly $2.9 million for each adjuster. In Kansas City, it was over $82 million, or an average of $3.2 million for each adjuster. Canney Aff., ¶35.

**Physical Damage Adjusters' Payment of Millions in Settlement for Total Losses**

44.     For both the 2002 and 2003 calendar year, the physical damage claim adjusters in the Denver office settled over $39 million in claims for total losses. In Des Moines, the total loss settlements were over $12 million in 2002 and just under $12 million in 2003. In Kansas City, the numbers were over $29 million for 2002 and over $28 million for 2003. These numbers are for total losses only, not repairs. There were approximately 35 Physical Damage Claim Representatives, Analysts and Examiners in the Denver office in 2002 and in 2003. For Des Moines, there were approximately 18 in 2002 and in 2003. For Kansas City, there were approximately 25 in 2002 and in 2003. Thus, on average, each adjuster in those offices paid approximately $650,000 to $1.1 million in total loss claims alone. Canney Aff., ¶22.

45.     Baldozier believes he probably paid out over $1 million a year of American
Family's money, the majority of which was without supervisory approval.  Baldozier Dep.,
132:22-134:5.

**Physical Damage Adjusters' Savings of Millions in Settlements for Repairable Vehicles**

46.     In both 2002 and 2003, physical damage claim adjusters for the Denver office
saved American Family over $12 million by negotiating with the repair facilities.  For the Kansas
City office, it was over $4 million; for Des Moines, it was over $5 million.  That is, physical
damage claim adjusters were able to reduce repair facility estimates by those amounts.  Canney
Aff., ¶20.

**Analysts' Representation of the Company in Resolving Physical Damage Claims to
Vehicles**

47.     Analysts perform non-manual work for claims related to physical damage on
automobiles and other vehicles such as trucks, RVs, motorcycles, snowmobiles, boats and semi
trucks.  They do not create or sell insurance policies or act as an underwriter.  Nicholson Dep.,
55:8-56:8; Reynolds Dep., 148:18-150:4; Canney Aff., ¶16; Blumenthal Aff., ¶2; Call Aff., ¶5.

48.     An Analyst serves as American Family's representative with whom an insured,
claimant, repair facility, or lien holder works from the time an insurance claim is filed and
assigned throughout the completion of the claim, either by settlement or other resolution of the
claim.  Reynolds Dep., 86:13-25, 259:24-260:1; Stack Dep., 143:1-22, 199:2-13, 207:19-208:12,
210:20-24; Baldozier Dep., 32:14-33:19, 52:14-53:1, 57:13-58:8, 63:20-65:1, 123:6-124:2,
150:4-20; Nicholson Dep., 62:10-64:25, 78:23-80:14, 116:5-20, 121:25-123:7, 140:2-22; Call
Aff., ¶5; Canney Aff., ¶¶30, 37, 40, 42; Blumenthal Aff., ¶2.

49.     In an American Family performance evaluation, under the heading "Makes decisions/takes actions and works independently on claim files," Baldozier wrote "That's my job. I work alone" and explained in his deposition that he meant:

> When they set you up in the field, just like in a drive-in, just like in a total loss center, you are the representative of the company. It's your job to make decisions. That's what they tell you. They give you the training so you can make an accurate decision, a knowledgeable decision based on what you have been taught and then take action on the claim.
>
> And whether you are in a drive-in or in a total loss center, you are working independently on it. So you are the one. There's not three adjusters that are all three damage appraisers looking at one car. The independent person is you.

Baldozier Dep., 150:4-20, Dep. Ex. 64.

**Analysts' Work in the Office and in the Field**

50.     American Family employs Analysts to work both in the field and in the office. Canney Aff., ¶¶11, 13; Stack Dep., 79:1-80:1, 83:5-20; Saucedo Aff., ¶9.

51.     Baldozier, Nicholson, and Reynolds worked almost exclusively in the field whereas Stack worked both in-office and in the field. Baldozier Dep., 17:6-19:7, 209:6-8; Nicholson Dep., 34:25-36:15; Reynolds Dep., 76:9-14; Stack Dep. 81:22-84:5, 180:1-12.

**Independence of Analysts in the Field**

52.     Analysts in the field schedule appointments with insureds, claimants, and repair facilities and travel to the vehicle to adjust the claim. Canney Aff., ¶¶13, 18; Baldozier Dep., 28:21-31:1; Nicholson Dep., 209:25-210:19.; Stack Dep., 203:9-12; Saucedo Aff., ¶24; Call Aff., ¶5; Wells Aff., ¶8.

53.     Analysts in the field work out of their homes to resolve claims and receive a company car, a computer, a printer, a camera, a cell phone (or reimbursement for phone calls), a desk for the car, and a checkbook. Reynolds Dep., 80:12-81:13, 90:8-10; Nicholson Dep., 35:10-36:8; Baldozier Dep., 8:12-13; Canney Aff., ¶13; Saucedo Aff., ¶24; Call Aff., ¶5; Wells Aff., ¶7.

54.     American Family provides the technology for Analysts to provide a full-service office on wheels. Wells Aff., ¶8. Analysts are expect to examine a vehicle, write an estimate, resolve claims and make the payment all in one visit. Wells Aff., ¶8; Baldozier Dep., 212:19-215:15. There is no "middle man" for paying the claim. Wells Aff., ¶8.

55.     At times, Baldozier, Reynolds and Nicholson would "scope" vehicles and write estimates at home; that is, they would examine vehicles, take notes regarding the damage, and then complete the resolution of the claims from home rather than on-site. Baldozier Dep., 212:19-215:15; Nicholson Dep., 73:4-76:9, 185:23-186:8; Reynolds Dep., 163:15-165:24, 200:12-201:17.

56.     American Family believed "scoping" vehicles was inefficient and wanted adjusters to resolve claims on-site. Baldozier Dep., 212:19-215:15; Nicholson Dep., 73:4-76:9, 185:23-186:8; Reynolds Dep., 163:15-165:24; Call Aff., ¶12; Wells Aff., ¶8.

57.     Analysts who work in the field do not "punch a time clock." They have flexibility to set their own appointments once the claim is assigned. They schedule their own work day and operate with limited supervision. Stack Dep., 18:19-19:24, 199:2-13, 210:20-24; Reynolds Dep., 87:1-88:22, 259:24-260:1, 262:2-262:5; Nicholson Dep., 209:7-211:5; Baldozier Dep., 9:12-

13:3, 164:15-166:18, 174:14-175:17; Canney Aff., ¶¶13, 43; Saucedo Aff., ¶24; Wells Aff., ¶¶7-8.

58.    At times, Baldozier would go out into the field to examine damage to vehicles only three days a week and would spend the other two days doing office work at home. Baldozier Dep., 9:12-13:3, 233:22-235:1. Baldozier tried to arrange his schedule so that he could be home on Fridays. Baldozier Dep., 165:11-166:18.

59.    While Reynolds would begin traveling to his claims at around 7:30 a.m. each day, the time he returned varied between two and five p.m. Reynolds Dep., 87:1-89:1.

60.    Baldozier liked being in the field because he did not like being confined to an office. Baldozier Dep., 19:3-7.

61.    Analysts who work in the field seldom come to the office, sometimes as little as two or three times a year, and may come only for training, meetings or to pick up supplies. Baldozier Dep., 176:17-177:10; Reynolds Dep., 90:8-92:3; Stack Dep., 238:4-12; Nicholson Dep., 36:7-15; Call Aff., ¶6; Wells Aff., ¶7.

62.    Nicholson developed his own form letters and correspondence that he would send to insureds and claimants to help resolve claims more quickly. Nicholson Dep., 119:11-122:12, 134:4-17, 146:18-147:8, Dep. Exs. 91, 92, 93, 94.

**In-Office Adjusters**

63.    In-office Analysts evaluate written estimates of damages submitted by independent repair facilities selected by the insured or claimant, usually without examining the vehicle, and determine, for example, if there is any duplication, overlap or any "padding" on the estimate. Canney Aff, ¶11; Stack Dep., 83:5-89:17, 108:18-20; Saucedo Aff., ¶12.

64.     If an estimate does not "look right" to an in-office Analyst, he or she may discuss the issue with the body shop who wrote the estimate or has the discretion to send a field adjuster to examine the car.  Stack Dep., 88:9-89:11; Baldozier Dep., 185:17-187:9.

65.     A field adjuster would determine whether the estimate was higher than necessary to repair the vehicle based on his or her experience.  Baldozier Dep., 185:17-187:9.

66.     When Stack applied for an Analyst position at American Family initially, he withdrew from consideration because he learned the position was for an in-office adjuster; he did not want an inside position because he was "not real happy working inside."  Stack Dep., 79:1-80:24.  He stated further that "[t]here were set working hours for the individuals who worked within the office as opposed to – you had more freedom to work, you know.  You could start early, end early; start late, end late, you know, as long as you did your time."  Stack Dep., 18:24-19:24.

## Analysts' Assurance of Proper Coverage Under the Policy

67.     Analysts may examine some issues related to coverage, such as determining if the insured had a policy in effect at the time of the loss, the proper deductible amounts for the loss, whether an accident falls under comprehensive or collision portions of an insured's policy, whether an insured has rental coverage, any potential fraud, whether an accident is a covered loss, and whether there is any prior damage to the vehicle unrelated to the accident.  Baldozier Dep., 33:2-19, 35:8-38:14, 81:22-87:8, 111:23-114:21, 120:8-121:23, 139:14-23, 201:18-202:14, Reynolds Dep., 134:17-138:14, 171:10-176:15, 177:25-179:10, 234:20-237:5, Stack Dep., 41:3-42:17, 67:21-68:20, 124:12-126:7, 206:5-14, 252:9-256:1, 261:4-264:1, 268:23-270:19,

Nicholson Dep., 101:1-102:7, 123:8-124:5, 138:23-139:13; Saucedo Aff., ¶25; Blumenthal Aff., ¶9; Wells Aff., ¶¶9-14, 34; Hill Aff., ¶9; Canney Aff., ¶¶23-26, Exs. B, C, D.

68.    An Analyst's determination of which policy coverage applied, for example, comprehensive versus collision, could affect the amount paid to the insured. Reynolds Dep., 171:10-173:5; Wells Aff., ¶11.

69.    All Analysts have access to copies of the standard insurance policies and endorsements for their use in resolving claims. Wells Aff., ¶14.

70.    If coverage for a claim is denied erroneously, American Family may be exposed to damages for bad faith, including potentially punitive damages. Canney Aff., ¶34.

71.    Analysts need to be aware of the importance of avoiding bad faith handling of claims. Stack Dep., 206:2-25.

**Analysts' Evaluation of Risk and Loss**

72.    Analysts may assist American Family's Special Investigation Unit (SIU) or its legal department with claims as needed. Baldozier Dep., 36:20-37:16, 40:3-44:23, Dep. Ex. 50 at PLRB000173; Reynolds Dep., 237:16-238:10; Canney Aff., ¶36; Call Aff., ¶10; Wells Aff., ¶38. Baldozier testified in court on behalf of American Family three times, and was scheduled to testify a fourth time but one of the parties did not appear. Baldozier Dep., 40:3-44:23.

73.    Analysts may determine where an impact occurred or whether damage is consistent with a particular version of events. Canney Aff., ¶32; Wells Aff., ¶13; Call Aff., ¶10. Because the Analyst is the only person that examines the vehicle, his or her opinion regarding these questions is crucial in determining how the claim is resolved. Wells Aff., ¶13.

74.    Analysts identify discrepancies or potential fraud that arise in investigating a claim. Stack Dep., 41:13-19, 204:2-11, 206:5-14; Baldozier Dep., 35:8-39:17, 201:18-202:14; Reynolds Dep., 177:24-179:10, 232:20-233:4; Canney Aff., ¶33; Hill Aff., ¶9; Call Aff., ¶10.

75.    Examples of fraud would be if a claimant contended that he or she put $30,000 worth of enhancements on a $15,000 car or someone reporting a car being stolen that had no evidence of forced entry. Canney Aff., ¶33; Wells Aff., ¶10.

76.    An Analyst may receive training on evaluating the credibility of an insured or claimant and may perform such evaluations in resolving a claim. Baldozier Dep., 37:9-39:17, 190:21-191:24, Dep. Ex. 71; Blumenthal Aff., ¶7; Hill Aff., ¶9.

77.    Analysts examine vehicles that have been involved in a fire and determine the cause and origin of the fire. Stack Dep., 204:2-205:9; Nicholson Dep., 53:7-19; Reynolds Dep., 169:6-17; Canney Aff., ¶36; Wells Aff., ¶38; Call Aff., ¶10.

78.    Analysts identify situations that should be reviewed by underwriting. Stack Dep., 204:2-205:3, 206:5-19; Baldozier Dep., 48:25-49:25; Canney Aff., ¶39; Hill Aff., ¶9; Blumenthal Aff., ¶8.

79.    Analysts notify underwriters or management of situations that may cause the company to assume or continue an improper risk. Baldozier Dep., 48:25-49:25; Canney Aff., ¶39.

80.    Analysts are responsible for recognizing and investigating subrogation claims, which would include recommending a referral to a subrogation unit if the adjuster believes it appropriate. Baldozier Dep., 45:7-48:24; Reynolds Dep., 186:2-15, 202:24-203:24, 272:12-273:2; Wells Aff., ¶15; Hill Aff., ¶9; Blumenthal Aff., ¶12.

81.   A potential subrogation claim would be if a manufacturer had recalled a vehicle for faulty brakes, and the insured's brakes failed, causing an accident. Baldozier Dep., 45:7-47:13, 148:12-150:3; Wells Aff., ¶15.

82.   An Analyst must be aware of the recall and the potential that American Family could recover from the manufacturer in subrogation for the faulty brakes. Wells Aff., ¶15; Baldozier Dep., 148:12-150:3.

83.   For one of his claims, Baldozier was able to get an Audi dealership to pay for a transaxle repair because of a manufacturer's defect. Baldozier Dep., 72:25-74:19. Baldozier went "all the way to Audi divisional headquarters to resolve this issue" because "[t]hat's what we're required to do. I was doing my job there, yeah." Baldozier Dep., 74:15-19.

84.   In evaluating any claim, an important component of an Analyst's job is to look for prior damage. Based upon his or her judgment, perception and experience, an Analyst must determine whether damage is related to the loss claimed. Stack Dep., 41:20-42:17, 124:12-126:7, 252:9-264:17, 268:9-270:19; Baldozier Dep., 81:22-87:8, 111:23-114:21, 201:18-202:14; Reynolds Dep., 173:6-176:1; Nicholson Dep., 100:15-101:5; Canney Aff., ¶19; Wells Aff., ¶34; Saucedo Aff., ¶25; Blumenthal Aff., ¶¶5-7, 9; Call Aff., ¶11; Hill Aff., ¶9.

85.   An Analyst may deny any part of the claim caused by prior damage and subtract that prior damage from any actual cash value determination (if a total loss) or from the cost of repair. Baldozier Dep., 81:22-87:8, 111:23-114:21, 121:5-23; Reynolds Dep., 173:6-176:1; Stack Dep., 268:9-270:19; Wells Aff., ¶34; Blumenthal Aff., ¶9.

86.   An adjuster decides the monetary value to subtract for any prior damage. Wells Aff., ¶34.

**Analysts' Protection of Property Rights**

87.     To resolve a claim, an Analyst must consider all parties that have insurable

interest in the vehicle including the owner, the named insured, any lien holder, or any lessor. If

there is a lien holder on a vehicle considered to be a total loss, the Analyst must protect the lien

holder's interest and include the lien holder on any payment to the insured. Baldozier Dep.,

31:2-32:5; Nicholson Dep., 104:16-107:4, Dep. Ex. 80 at AMFAM 2391; Reynolds Dep.,

231:16-232:11; Canney Aff., ¶36; Saucedo Aff., ¶25; Call Aff., ¶10; Hill Aff., ¶9; Wells Aff.,

¶¶9, 22.

**Analysts' Use of Discretion and Judgment to Resolve Claims for Repairable Vehicles**

88.     An Analyst who works in the field typically inspects the property damage to the

vehicle and prepares a damage estimate based on his or her training and experience. Stack Dep.,

204:2-205:18; Baldozier Dep., 28:21-31:1, 128:14-19, 185:17-187:9; Reynolds Dep., 108:3-23;

Canney Aff., ¶19; Call Aff., ¶5; Saucedo Aff., ¶24; Blumenthal Aff., ¶2.

89.     To prepare a damage estimate, an Analyst may need to contact the owner about

any added-on equipment or recent repairs to the car. Reynolds Dep., 103:6-105:2; Nicholson

Dep., 166:20-168:25, 205:4-206:7.

90.     For all estimates, an Analyst determines appropriate levels of "betterment" after

the repair is completed. Stack Dep., 122:6-123:22, 166:14-169:4; Baldozier Dep., 63:2-19;

Reynolds Dep., 204:6-20; Canney Aff., ¶19; Wells Aff., ¶¶34-35; Saucedo Aff., ¶25; Hill Aff.,

¶9. Betterment is the opposite of depreciation. It is the improvement value an insured receives

because his or her vehicle is repaired with parts that have less wear than the part damaged by the

accident. Stack Dep., 123:1-7, 166:14-169:4; Baldozier Dep., 63:2-19; Wells Aff., ¶35.

91.     An Analyst may identify industry approved equipment needed to complete repairs. Stack Dep., 208:5-12; Reynolds Dep., 253:17-254:6; Canney Aff., ¶¶19, 37.

92.     Analysts decide whether to repair or replace parts that are damaged from an accident. Stack Dep., 161:15-162:20; Reynolds Dep., 138:17-143:21; Reynolds Dep., 182:6-184:10; Wells Aff., ¶¶27, 29, 37; Canney Aff., ¶19; Blumenthal Aff., ¶¶5-6; Call Aff., ¶¶6, 11; Saucedo Aff., ¶24.

93.     Approximately 25% to 40% of an adjuster's total estimates involve a decision of whether to repair or replace a part on a damaged vehicle. Wells Aff., ¶29.

94.     Reasonable Analysts may disagree and come to different conclusions about whether a part should be repaired or replaced. Reynolds Dep., 180:3-184:10.

95.     In his experience as a body shop manager, Reynolds testified that a claims adjuster and a repair facility would disagree sometimes about a judgment item such as whether a part should be repaired or replaced. Reynolds Dep., 29:8-30:4. Shannon Blumenthal, currently an Analyst in the Des Moines office, states similarly that she may disagree with a body shop about whether a part needs to be repaired or replaced. Blumenthal Aff., ¶5.

96.     Often, body shops prefer to replace a damaged part than repair it. Reynolds Dep., 29:18-30:8, 139:5-143:21. Body shops also prefer to replace a damaged part with an original equipment manufacturer (OEM) part rather than an aftermarket part because they make more money from using the OEM part. Reynolds Dep., 32:17-34:23, 139:5-143:21.

97.     If an Analyst decides to replace a damaged part, he or she must also specify whether to complete the repair with an OEM, aftermarket, or salvage part. Saucedo Aff., ¶24; Wells Aff., ¶¶27-29; Canney Aff., ¶19; Blumenthal Aff., ¶6; Hill Aff., ¶9.

98.     An Analyst has the discretion to authorize an OEM instead of an aftermarket part if, for example, an aftermarket part is ill-suited, an OEM part is the same price, or shipping would take too long,. Baldozier Dep., 58:18-62:14; Reynolds 255:13-256:24 ; Nicholson Dep., 68:21-69:19; Stack Dep., 166:14-167:6; Saucedo Aff., ¶24; Wells Aff., ¶¶27-29; Canney Aff., ¶19; Blumenthal Aff., ¶6.

99.     If an Analyst decides to repair instead of replace a part, the Analyst must determine the cost of the repair, including the labor costs associated with repairing the part. An adjuster always determines repair time and costs personally; repair times and cost are not available to an adjuster on any software. Analysts determine repair times based upon their knowledge of the process needed to repair the part and their own experience. Baldozier Dep., 184:8-185:9; Reynolds Dep., 158:10-159:15, 186:16-187:15, Dep. Ex. 8 at 11-12; Nicholson Dep., 17:5-15, 67:6-21; Call Aff., ¶¶6, 11; Wells Aff., ¶¶29, 37.

100.    Analysts must also determine the value for any equipment added onto the vehicle that increases the vehicle's value, such as stereo equipment, chrome wheels, or ground effects. There is no computer program that identifies the value for this equipment. Analysts typically investigate the price of such equipment from an aftermarket source and make adjustments to that price to determine the additional value to the insured's vehicle. Reynolds Dep., 165:25-167:8; Wells Aff., ¶16.

101.    Analysts do not have any computer programs to use for evaluating property damage to boats, motorcycles, RVs, snowmobiles or semi-trucks. Nicholson Dep., 60:2-9, 91:2-10; Reynolds Dep., 148:18-150:14; Stack Dep., 256:13-259:19, 263:6-264:17. In those cases, an Analyst researches the costs of repair and the total loss value by contacting other companies to

get prices for parts, seeking quotes from other repair facilities, or performing other research. Reynolds Dep., 148:18-151:25; Stack Dep., 256:13-264:5.

102.     Stack testified that repair methods for cars and boats are different, and that an adjuster must use his or her judgment to resolve a claim involving a boat.  Stack Dep., 46:21-48:20.

103.     An Analyst has the discretion to offer an insured an "appearance allowance," which is when an insured foregoes a cosmetic repair, such as a scratch on a fender, in exchange for money.  Nicholson Dep., 94:1-19; Reynolds Dep., 113:15-114:17; Wells Aff., ¶31; Hill Aff., ¶9.

104.     No computer program or book provides the amount for an appearance allowance. Wells Aff., ¶31.

105.     An appearance allowance is within the discretion of the adjuster and must be negotiated with an insured.  Reynolds Dep., 113:15-114:7; Wells Aff., ¶31.

106.     Included in the determination of the cost to repair is an Analyst's opinion whether there is likely to be damage hidden from view upon estimating the vehicle.  Reynolds Dep., 106:13-107:25, 161:17-14; Wells Aff., ¶20; Hill Aff., ¶9; Blumenthal Aff., ¶10.

107.     An adjuster's experience may tell him or her that damage on one part of a vehicle may indicate damage elsewhere, even though an Analyst could not see that damage from looking at the vehicle.  Wells Aff., ¶20; Blumenthal Aff., ¶10.

108.     An Analyst has to anticipate what hidden damage may have occurred and factor those costs into the determination of the cost of repair.  Wells Aff., ¶20; Blumenthal Aff., ¶10.

109.    There are no computer programs or books that identify hidden damage or how long a shop may take to repair a vehicle. Wells Aff., ¶20.

110.    For ten to twenty percent of his claims involving repairable vehicles, Nicholson did not examine a vehicle and write an estimate personally; rather, he had an insured's body shop write an estimate and provide digital pictures of the damage. Nicholson then reviewed the estimate and decided whether the estimate was fair. Nicholson Dep., 134:18-138:14, 146:18-148:13.

111.    Estimates are subjective and there may be differences between a body shop's written estimate and an Analyst's written estimate. Nicholson Dep., 148:23-149:19, 204:22-205:20, Dep. Ex. 91.

112.    Stack testified that in a previous job at a body shop, he would negotiate repair amounts, repair times and methods with insurance adjusters. Stack Dep., 54:8-55:15.

113.    Analysts mediate differences among all concerned parties to bring a claim to a satisfactory settlement, and may work with a body shop if an insured is unhappy about the repairs to resolve the dispute. Baldozier Dep., 63:20-65:7; Hill Aff., ¶9.

114.    Analysts receive training on structural repairs to point out to body shops if there are more efficient ways to repair a vehicle within the manufacturer's specifications. Baldozier Dep., 74:20-75:23.

**Analysts' Use of Discretion and Judgment to Resolve Total Loss Claims**

115.    Analysts also determine if a vehicle is a "total loss," that is, if the estimated cost of repair exceeds the vehicle's actual cash value. Reynolds Dep., 105:24-107:25; Nicholson

Dep., 208:4-12, Dep. Ex. 109; Baldozier Dep., 51:13-56:24; Canney Aff., ¶21; Call Aff., ¶¶6, 11; Blumenthal Aff., ¶¶2, 11; Saucedo Aff., ¶19; Wells Aff., ¶16.

116.    An analyst and a body shop may disagree on whether a vehicle is a total loss or repairable. Nicholson Dep., 204:22-205:20.

117.    To determine whether a vehicle is a total loss, Analysts must determine the condition of the vehicle's exterior, interior, tires and mechanical system. Baldozier Dep., 105:25-108:13, 187:11-188:25, Dep. Exs. 54 & 70; Reynolds Dep., 108:3-110:24, 114:18-115:20, Dep. Ex. 4 at 14-16; Stack Dep., 169:20-170:20; Nicholson Dep., 107:14-108:9; Wells Aff., ¶17; Canney Aff., Ex. A.  For each of the four categories, an Analyst provides one of four ratings:  fair, private, dealer or superb. Baldozier Dep., 105:25-108:17, 187:11-189:4, Dep. Exs. 54 & 70; Reynolds Dep., 114:18-115:20, Dep. Ex. 4 at 15; Stack Dep., 169:20-170:20; Wells Aff., ¶17; Canney Aff., Ex. A.  Even within these four ratings, Analysts must also provide a numerical rating to the vehicle's condition of its exterior, interior, tires, and mechanical system. Baldozier Dep., 105:25-111:22, 187:11-190:19, Dep. Exs. 54 & 70; Reynolds Dep., 114:18-121:25, Dep. Ex. 4 at 15; Wells Aff., ¶17; Canney Aff., Ex. A.

118.    An Analyst would examine a vehicle's fan belts and other items and determine whether the vehicle was in good condition mechanically. Reynolds Dep., 110:12-111:2.

119.    Reasonable Analysts may disagree about the numerical rating of a vehicle's condition and come to different conclusions. Baldozier Dep., 105:25-111:22, 187:11-190:19, Dep. Exs. 54 & 70.    A different numerical rating affects their determination of the actual cash value of the vehicle. Wells Aff., ¶¶19, 36; Reynolds Dep. 114:18-123:13; Baldozier Dep. Exs. 54 & 70.

120.   At times, insureds would disagree with an Analyst's determination of the condition of their vehicles. Reynolds Dep., 108:3-112:13.

121.   Analysts may use different sources to determine the actual cash value of the vehicle. Baldozier Dep. Ex. 50 at PLRB000177; Blumenthal Aff., ¶6; Call Aff., ¶10; Wells Aff., ¶18. An Analyst may determine the actual cash value by using the NADA price guides, Auto Source (ADP), or may examine the price of comparable vehicles. Baldozier Dep., 51:5-56:24, 95:20-100:11, 105:1-107:8; Reynolds Dep., 120:19-127:13, 246:7-247:25, 251:7-252:13; Nicholson Dep., 70:13-71:23; Wells Aff., ¶18. Analysts may chose among the different sources or may average these sources together to determine the actual cash value. Baldozier Dep., 95:20-100:11, 105:1-111:22; Reynolds Dep., 114:18-129:5, 251:7-252:13; Nicholson Dep., 107:14-109:18, 142:2-144:16.

122.   In negotiating a total loss settlement, an owner may wish to retain the damaged vehicle. Baldozier Dep., 91:17-92:18; Nicholson Dep., 92:5-93:25; Wells Aff., ¶23. In such situations, the Analyst must determine the salvage value of the vehicle. Nicholson Dep., 92:5-93:25; Wells Aff., ¶23; Call Aff., ¶10.

123.   Salvage laws are different for each state, and an Analyst must have knowledge of the state law that applies. Wells Aff., ¶23.

124.   Salvage values can be determined by contacting salvage yards and receiving a value from them. Baldozier Dep., 91:17-92:18; Nicholson Dep., 92:5-93:25; Wells Aff., ¶23. Other times, Analysts supply their own salvage value based on their years of experience. Wells Aff., ¶23.

125.    Stack was an Analyst who, on occasion, supplied a salvage value based on his experience. Stack Dep., 212:22-213:4.

126.    Analysts spend more time resolving total loss claims than claims for repairable vehicles. Baldozier Dep., 217:24-220:19, Nicholson Dep., 113:2-116:4, 134:18-137:14, 145:16-146:17. If an insured or claimant asks for an unreasonable amount to settle a total loss claim, it could take an Analyst a month or two to settle the claim. Baldozier Dep., 218:20-220:19.

127.    Nicholson, Baldozier and Reynolds believe they adjusted more total losses than other adjusters.   Reynolds Dep., 129:2-23; Baldozier Dep., 217:24-218:19; Nicholson Dep., 134:18-137:14.

## Analysts With Customer Repair Program Duties

128.    An Analyst may have job duties with respect to American Family's Customer Repair Program (CRP). Baldozier Dep., 191:25-192:22; Canney Aff., ¶12; Reynolds Dep. Ex. 27.

129.    Under the CRP program, American Family approves independent repair facilities to repair an insured or claimant's vehicle without an American Family adjuster ever examining the vehicle. Canney Aff., ¶12; Baldozier Dep., 191:25-194:20.

130.    CRP adjusters monitor the performance of these shops and resolve any problem that may occur between the body shop and the insured or claimant. Canney Aff., ¶12; Baldozier Dep., 191:25-194:20, 196:14-199:9.

131.    CRP adjusters would perform "reinspections" of vehicles inspected by CRP shops to make sure the shops "were being fair and honest as a representative to, say, of American Family." Baldozier Dep., 191:25-194:20.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  1:04-CV-2174-WYD-CBS

ROCKY BALDOZIER,
ERIC STACK,
ROBERT REYNOLDS, and
JOK NICHOLSON, on behalf of themselves and all others similarly situated,

　　　　Plaintiffs,

vs.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,

　　　　Defendant.

---

**APPENDIX II – STATE LAW AND UNPUBLISHED AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Munizza v. State Farm Mut. Auto. Ins. Co., No. 95-35794, 1996 WL 711563 (9th Cir.
Nov. 7, 1996)

Spence v. Grange Mut. Cas. Ins. Co., No. 81AP-284, 1981 WL 3378, at *3 (Ohio Ct.
App. July 30, 1981